In the Matter of the Application of THE NEW YORK ELEC-
TRIC LINES COMPANY, Appellant, for a Writ of Mandamus
against THE EMPIRE CITY SUBWAY COMPANY, LIMITED,
Respondent.

Streets — power of legislature, directly or by delegated authority,
to grant or revoke licenses to use the streets for public or
private purposes.

The legislature has no power to take from a private corporation its vested
property rights; but its power in directing the use of public streets
and highways throughout the state is without limit, and instead of
exercising the power directly it may authorize it to be executed by
local authority.

The granting of a permit by a city to a corporation to use the streets for
a purpose is a license merely, revocable at the pleasure of the city,
unless it has been accepted and some substantial part of the work con-
templated by the permission and sufficient to create a right of property
and thus form a consideration for the contract has been performed.

Relator was incorporated for the purpose of owning, constructing and
leasing lines of telegraph wires or other electrical conductors, for tele-
graphic and telephonic communication and for electrical illumination,
to be placed under the pavements in New York city. In 1883 a resolu-
tion of the common council permitted it to lay its wires in the streets
and to make connections of such wires underground by means of dis-
tributing conduits. The permission, however, was granted upon the
condition that the relator should not transfer or dispose of the franchise
granted without the further authority of the common council. The
board of estimate and apportionment, which succeeded to the powers of
the common council, revoked the resolution of 1883 in 1906. The relator
has never attempted to engage in the business of electric lighting, or of
supplying transmitters and receivers for telephonic communication, or
of instruments for telegraphing. In 1891 an agreement was entered
into with defendant on behalf of the city relative to conduits for low
tention wires by which the defendant also agreed to lease a space in its
subways to any company having lawful power to operate telegraphic
or telephonic conductors in any street of the city. Relator now
seeks to place its wires in the electrical conduits of defendant for the
purpose of renting them to another company which desires to engage
in such business. *Held*, that the contention that it may now do so
under the resolution of the common council of 1883 would be giving to
it powers not embraced in or contemplated by the resolution and should

21

not now be adopted or sanctioned, and that the board of estimate and apportionment had the power to and did revoke the permit granted to the relator under that resolution.

*Matter of New York Electric Lines Co.*, 140 App. Div. 934, affirmed.

(Argued February 7, 1911; decided March 28, 1911.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered November 25, 1910, which affirmed an order of Special Term denying as matter of law and not in discretion a motion for a peremptory writ of mandamus to compel t' defendant to admit and assign space in its conduits for vires of the petitioner.

The facts, so far as material, are stated in the opinion.

*Alton B. Parker, Henry A. Gildersleeve, Jerry A. Wernberg* and *J. Aspinwall Hodge* for appellant. The Lines Company is an existing corporation having lawful power to operate electric conductors in the city of New York. (*Day* v. *O. & L. C. R. R. Co.*, 107 N. Y. 129; *People* v. *U. & D. R. R. Co.*, 128 N. Y. 240; *Matter of B., W. & N. Ry. Co.*, 72 N. Y. 245; *B. S. T. Co.* v. *City of Brooklyn*, 78 N. Y. 524; *Matter of B. E. R. R. Co.*, 125 N. Y. 434.) The grant to the Lines Company was complete upon acceptance, and vested the grantee with a present interest, limited as to the city only by the conditions expressly imposed, and subject only to the police power of the state. (*Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *Trustees of Southhampton* v. *Jessup*, 162 N. Y. 122; *People* v. *O'Brien*, 111 N. Y. 1; *C. I. E. R. R. Co.* v. *Kennedy*, 15 App. Div. 588; *People* v. *Sturtevant*, 9 N. Y. 263; *Davis* v. *Mayor, etc.*, 14 N. Y. 506, *Milhau* v. *Sharp*, 27 N. Y. 611; *Mayor, etc.*, v. *T. A. R. R. Co.*, 33 N. Y. 42; *City of Buffalo* v. *D., L. & W. R. R. Co.*, 126 App. Div. 122; *Detroit* v. *D. C. S. R. Co.*, 184 U. S. 368.) The Lines Company by its acceptance of the grant from state and city, followed by the expenditure of money, the incurring of obligations, entering into contracts, and by attempting to build its conduits and to lay its wires in

the conduits of the Empire Company, has acquired the same rights that the actual construction of conduits would give it. (*People* v. *A. & V. R. R. Co.*, 24 N. Y. 261; *Hinman* v. *Clarke*, 121 App. Div. 105; *S. R. T. Co.* v. *Mayor, etc.*, 128 N. Y. 510; *R. W. Co.* v. *City of Rochester*, 176 N. Y. 38.) The attempted revocation was ineffective because it was an act of the city, and no power of revocation had been delegated by the state to the city, and no right to revoke its consent was reserved by the city. (*People* v. *U. & D. R. R. Co.*, 128 N. Y. 240; *People* v. *A. & V. R. R. Co.*, 24 N. Y. 261; *Dusenbury* v. *N. Y. W. & C. T. Co.*, 46 App. Div. 267; *N. O. G. L. Co.* v. *L. L. Co.*, 115 U. S. 650; *City of Morristown* v. *E. T. Tel. Co.*, 115 Fed. Rep. 304; *N. Tel. Co.* v. *City of Fremont*, 99 N. W. Rep. 811; *Steward* v. *Vil. of Ashtabula*, 98 Fed. Rep. 516; *Africa* v. *Bd. of Aldermen*, 70 Fed. Rep. 729; *Foster* v. *City of Joliet*, 27 Fed. Rep. 899.) The grant by the state accepted by the Lines Company is protected by the constitutional guaranties, and the resolution of the board of estimate and apportionment of April, 1906, was a nullity. (*Mayor, etc.*, v. *S. A. R. R. Co.*, 32 N. Y. 261; *N., etc., R. Co.* v. *H., etc., R. Co.*, 102 Va. 795; *Fletcher* v. *Peck*, 6 Cranch, 87; *Buffet* v. *G. W. R. R. Co.*, 25 Ill. 310.) The Lines Company has fulfilled every requirement of its charter and every condition of its franchise, and on the merits has not been guilty of nonuser or laches. (*People* v. *B. T. Co.*, 23 Wend. 222; *S. T. & T. Co.* v. *Kearney*, 68 App. Div. 283.)

*Alexander S. Bacon, Charles L. Withrow* and *Arthur N. Taylor* for Great Eastern Telephone Company, intervening. The effect of the acts of 1885 and 1886, in exercise of the police powers of the legislature, was merely to modify or regulate the relator's franchise, not to destroy or impair it. (*People ex rel. Woodhaven* v. *Deehan*, 153 N. Y. 528; *J. C., etc., Ry. Co.* v. *Passaic*, 68 N. J. L. 110.) The relator's secondary franchise constitutes property. (*People* v. *O'Brien*, 111 N. Y. 1, *People ex rel.*

*C. I. & B. R. Co.* v. *Neff*, 15 App. Div. 585; *People ex rel.* v. *Tax Comrs.*, 174 N. Y. 417; *Lord* v. *E. L. Assur. Society*, 194 N. Y. 212; *C. I. F. H. B. R. R. Co.* v. *Kennedy*, 15 App. Div. 588; *City of Rochester* v. *R. Ry. Co.*, 182 N. Y. 99.) A secondary franchise cannot be revoked by the legislature. (*City of New York* v. *Bryan*, 196 N. Y. 158; *S. R. T. Co.* v. *Mayor, etc.*, 128 N. Y. 510.) A secondary franchise cannot be revoked by the board of estimate and apportionment acting as the municipal legislature. (*State* v. *Mayor, etc.*, 3 Duer, 119; *People ex rel. M. S. Ry. Co.* v. *Tax Comrs.*, 174 N. Y. 417; *Milhau* v. *Sharp*, 27 N. Y. 611; *B. C. R. R. Co.* v. *B. C. R. R. Co.*, 32 Barb. 358.)

*Edmund L. Mooney, John H. Cahill, Frederick A. Card* and *Charles T. Russell* for respondent. The appellant did not commence the transaction of its business within one year from the date of its incorporation, and, therefore, its corporate powers ceased. The appellant is not now an existing corporation having lawful power to operate telegraph or telephone conductors, nor is it a corporation lawfully competent to operate electrical conductors. (*B. S. T. Co.* v. *City*, 78 N. Y. 524; *Matter of B., W. & N. Ry. Co.*, 72 N. Y. 245; *Matter of B., Q. C. & S. R. R. Co.*, 185 N. Y. 171; *City of New York* v. *Bryan*, 196 N. Y. 158; *Ward* v. *Sea Ins. Co.*, 7 Paige, 294; *Matter of J. M. Ins. Co.*, 4 Sandf. Ch. 559; *Cooper Mfg. Co.* v. *Ferguson*, 113 U. S. 727; *Matter of A., etc., R. Co.*, 9 Blatchf. 390, 398; *Holmes* v. *Holmes*, 40 Conn. 117; *State of Vermont* v. *Bradford Bank*, 71 Vt. 234; *Am. Glucose Co.* v. *New Jersey*, 43 N. J. Eq. 280.) The permission granted to the appellant by the resolution of the common council of April 10, 1883, is no longer in force. The appellant has no right thereunder to lay wires in the streets of the city of New York nor to enter the subways for that purpose. (*People ex rel. N. Y. E. Lines* v. *Ellison*, 115 App. Div 254; *People* v. *Squire*, 14 Daly, 154; 145 U. S. 175; *C. C. L. & F. Co.* v. *City of Tallahasese*, 186 U. S. 401; *W. U. Tel. Co.* v. *City of Syracuse*, 24 Misc. Rep. 338; *Belleville* v.

*C. H. Ry. Co.*, 152 Ill. 171; *Chicago* v. *C. Tel. Co.*, 230 Ill. 157; *C. C. Ry. Co.* v. *People ex rel. Story*, 73 Ill. 541; *Pearsall* v. *Great Northern Railway*, 161 U. S. 646; *City Ry. Co.* v. *C. St. Ry. Co.*, 166 U. S. 557; *P. T. C. Co.* v. *City of Baltimore*, 156 U. S. 210; *G. C. Ry. Co.* v. *G. C. S. Ry. Co.*, 63 Tex. 529; *City of St. Louis* v. *W. U. Tel. Co.*, 148 U. S. 92; *Harshman* v. *Bates County*, 92 U. S. 569.) The permission or secondary franchise was lost by nonuser and abandonment. (*City of New York* v. *Bryan*, 196 N. Y. 158; *L. T. Co.* v. *Cincinnati*, 76 Fed. Rep. 296; *D., L. & W. R. R. Co.* v. *City of Oswego*, 92 App. Div. 551; *Henderson* v. *C. P. Ry. Co.*, 21 Fed. Rep. 358.) The appellant lost whatever right it had, if any, by laches and the Statute of Limitations, and was not entitled to a peremptory mandamus. (*People ex rel. Nelson* v. *Marsh*, 82 App. Div. 571; 178 N. Y. 618; *People ex rel. Phelps* v. *Delaware Common Pleas*, 2 Wend. 257; *People* v. *Collis*, 6 App. Div. 467; *People ex rel. Connolly* v. *Board of Education*, 114 App. Div. 1; 187 N. Y. 535; *People ex rel. Millard* v. *Chapin*, 104 N. Y. 96.)

HAIGHT, J. The New York Electric Lines Company, which we will hereafter call the relator, was incorporated on the 14th day of October, 1882, under the provisions of chapter 265 of the Laws of 1848 and acts amendatory thereof and supplementary thereto, for the purpose of " owning, constructing, using, maintaining and leasing lines of telegraph wires or other electric conductors for telegraphic and telephonic communication and for electric illumination, to be placed under the pavements of the streets, avenues and public highways of the cities of New York and Brooklyn in the state of New York."

On the 10th day of April, 1883, the board of aldermen of the city of New York adopted resolutions permitting the relator to lay its wires or other conductors of electricity in and through the streets, avenues and highways of New York city and to make connections of such wires or conductors under-

ground by means of the necessary vaults, test boxes and distributing conduits, and thence aboveground to points of electric illuminations or telegraphic and telephonic signals, in accordance with the provisions of an ordinance passed by the common council and approved by the mayor December 14, 1878, which required, in substance, that the work should be performed under the control and supervision of the commissioner of public works. The permission, however, was granted upon the condition that the relator shall not transfer or dispose of the franchise granted without the further authority of the common council and upon the further condition that it will make no discrimination of individuals or corporations in the rental or use of its lines or wires and that the city, at its option, may require the relator to pay into the city treasury two per cent of its gross receipts derived from the rental of its wires under the franchise granted.

In December, 1878, an ordinance of the common council of the city of New York was adopted regulating the laying of subterranean telegraph and electric wires in the streets of the city, and subsequently the legislature, by chapter 534 of the Laws of 1884, required all telegraphic, telephonic and electric light wires and cables used in the city over the streets thereof to be placed under the streets within a time specified, and in case the owners thereof failed to so do the government of the city was directed to remove the wires and poles upon which they were placed from the streets of the city wherever found. In view, however, of the fact that no subways had been at that time constructed, into which the overhead wires could be placed, the legislature in the following year, by chapter 499 of the Laws of 1885, created a board of commissioners of electrical subways, which was authorized to adopt a plan for the construction of underground subways or conduits, through which electric wires may be conducted, and upon the construction thereof, to compel all companies having wires upon the streets to place the same in such subway or conduits. The board, after giving notice to the companies operating or intending to operate electrical conductors in the city, includ-

ing the relator, to submit suitable plans for the adoption of the board for the carrying out of the provisions of the act, finally adopted a plan by which the city should enter into a contract with a company to construct conduits with ducts of sufficient number to supply the necessary requirements of the existing companies operating electrical wires, and also of such additional space as would probably be required in the future; and that upon the completion thereof companies operating wires upon the streets should be required to place the same in the ducts of the conduit company, paying therefor such reasonable rental as should be determined between the company and the city.

Agreements were thereupon entered into by the commissioners with the Consolidated Telegraph and Electric Subway Company in 1886, which were, with some amendments and modifications, re-executed in 1887; and then, by chapter 716 of the Laws of 1887, the agreement, as so amended and modified, was expressly ratified and confirmed by the legislature; and after the passage of this act it was made unlawful for any corporation or individual to take up or excavate in any of the streets of the city for the purpose of laying underground electrical conductors, unless a permit therefor shall first be obtained from the board of electrical control. By chapter 263 of the Laws of 1892 it is further provided that "no such permit shall be granted by said board unless, if the application be for underground construction, there is an existing demand for the construction of such conduits or subways; nor unless the occupation of said conduits or subways is reasonably assured, and the public interests require the construction thereof." (Section 2.) These provisions, by the express terms of the statute, were made police regulations, thus preventing the streets from being constantly opened and occupied by every company having a franchise to maintain electrical wires over or under the streets of the city.

In 1891 a further contract was entered into pursuant to the provisions of chapter 231 of the Laws of 1891 relating to high tension wires, and, contemporaneously therewith, a fur-

ther agreement with the Empire City Subway Company, which relates to conduits of low tension wires, was executed in behalf of the city with such companies. Under the latter contract it is provided that a space in its subways, conduits and ducts shall be leased by it to any company or corporation "having lawful power to operate telegraphic or telephonic conductors in any street or avenue of the city of New York."

The resolution of the common council of April 10, 1883, giving the relator permission to lay wires or other electrical conductors underground, was revoked by the board of estimate and apportionment May 11, 1906, which board had succeeded to the powers of the common council pertaining thereto.

The law of 1885 was subsequently amended by chapter 716 of the Laws of 1887, in which the board of commissioners of electric subways was dispensed with and the powers and duties of the commission were devolved upon a board of electrical control, and subsequently such duties, by further amendment, have been transferred to the commissioner of water supply, gas and electricity.

In 1886, after the commission had rejected the bid of the relator and awarded the contract to the Consolidated Telegraphic and Electric Subway Company, the relator demanded of the commissioner of public works a permit to open the streets and to lay its subway under the resolution of the board of aldermen adopted in 1883, to which we have already alluded. This application was denied, and thereupon a motion for a peremptory writ of mandamus was made to the Court of Common Pleas, which was denied, and such denial was subsequently affirmed in the General Term of that court, in this court and in the United States Supreme Court. (1 N. Y. St. Repr. 633; 6 id. 281; 107 N. Y. 593; 145 U. S. 175.)

Again, in 1906 a further application was made to the Supreme Court for a mandamus to compel the commissioner of water supply, gas and electricity to grant the relator leave to open the streets and construct its subway, which was also refused, and the decision so rendered reviewed in 115 App. Div. 254, and in this court (188 N. Y. 523), in which cases

it has been held that the legislation of 1885 and 1887, under which a plan was adopted by the board of commissioners of electrical subways for the construction of a subway of conduits through which all companies authorized to transmit electric currents over the streets of the city were required to insert their wires, paying a reasonable rental therefor, was a valid exercise of the police powers of the legislature, and that the relator, having neglected to construct the subway under the permit granted by the common council of the city until after the passage of the act of 1885 and the adoption of the conduit system, no longer had the right to construct its subway under the permission granted by the common council. That question must, therefore, now be deemed finally settled and disposed of.

The question now remaining to be determined is as to whether the relator, under the resolution of the common council of April, 1883, has the right, as a matter of law, to have its wires inserted in the ducts of the Empire City Subway Company, notwithstanding the revocation of such resolution. By referring to the provisions of the relator's charter we find that it was incorporated for the purpose of owning, constructing, using, maintaining and leasing lines of telegraph wires or other electrical conductors for telegraphic and telephonic communication and for electrical illumination to be placed under the pavements of the city. The resolution of the common council permitted the relator to lay its wires or other conductors of electricity in and through the streets, and to make connections of such wires underground, by means of necessary vaults, test boxes and distributing conduits, and thence aboveground to points of electrical illuminations and telegraphic and telephonic signals, for which the relator agreed to pay to the city two per cent of its gross receipts derived from the rental of its wires. It will thus be observed that the main purpose of the relator's incorporation and of the permit granted by the city was to construct underground passages for the laying of wires or electrical conductors for the purpose of renting to persons or corporations hav-

ing the power to conduct the business of electric lighting, telegraphing or the maintaining of telephonic communication. It is not pretended that the relator ever had a wire strung or operated over the streets of the city, nor that it had ever entered into any business of telegraphing, telephoning or electric lighting. It does not now ask the right to place its wires in the electrical conduits for the purpose of conducting the business itself of telegraphing or the making of telephonic communication. What it seeks to do is to have its wires entered for the purpose of renting them to another company which desires to engage in such business. The case is, therefore, clearly distinguishable from that of the *Matter of Long Acre El. L. & P. Co.* (188 N. Y. 361); for in that case the company had not only a franchise but was actually engaged in lighting the streets with electricity at the times its poles were ordered removed and its wires placed underground. There being no conduits under the streets in which it was operating its franchise it was compelled to wait until such time as the streets were provided with conduits. It then asked for leave to insert its wires, and under those circumstances the relief was granted. But in this case the conduits were constructed in 1886 and 1887. This application was made in July, 1910, a delay of twenty-three years. In the meantime the legislature, as we have seen, had by various enactments provided for the establishing of a plan by which all electrical wires should be placed underground, and expressly prohibited interference with the streets by any other company or person without the consent of the board of electrical control or other board created by the legislature which had been invested with the powers of such board. The legislature, therefore, has itself practically annulled the resolution passed by the common council giving the relator a permit to construct underground subways for electrical wires or conductors, and its power so to do has been affirmed, as we have seen, not only in this court, but in the Supreme Court of the United States. In view of the fact that the relator has never attempted to engage in the business of electric lighting, or of

supplying transmitters and receivers for telephonic communi-
cation, or of instruments for telegraphing, and has never been
granted a franchise to occupy the conduits therefor, the con-
tention that it may now do so under the old resolution of the
common council of 1883, we think, would be giving to it pow-
ers not embraced in or contemplated by the resolution and
should not now be adopted or sanctioned.

After the passage of the resolution of the common council
in April, 1883, the relator formally accepted the same in
writing and subsequently filed a map of the streets of the city
which it proposed to occupy for subway purposes. While it
expended a considerable sum of money in procuring patents
and making experiments, it is not claimed a single stone was
removed from the pavements of the streets or a foot of con-
duit constructed under the permission granted for the inser-
tion of electrical wires or conductors. The question thus
arises as to whether a bare acceptance of the permit granted
by the resolution of the common council amounted to an
irrevocable franchise granted by the city. Clearly, in the
absence of partial performance under the permit, by which
some vested interest in property is acquired, the state does
not become bound by such permit, for that has been estab-
lished by the decisions that have already been rendered in this
and the Supreme Court of the United States with reference
to this relator's right in the matter. Of course, the legislature
of the state, under the authority of *Trustees of Dartmouth Col-
lege* v. *Woodward* (4 Wheat. 518), has no power to take from a
private corporation its vested property rights; but its power in
directing the use of public streets and highways throughout
the state is without limit, and instead of exercising the power
directly it may authorize it to be executed by local authorities.

In the case of *People* v. *Squires* (14 Daly, 154), ALLEN, J.,
says, with reference to the power of localities in granting
privileges for the use of the public streets: "Until such
grant has been accepted *and acted upon* it is a mere revocable
license and may be recalled at pleasure; but after it has been
accepted and acted upon it becomes a contract within the

meaning of the clause of the constitution which secures the inviolability of contracts, by declaring that no state shall pass any laws impairing their obligation." In the subsequent reviews of this case in the Court of Appeals and in the Supreme Court of the United States, to which we have already alluded, no question is made with reference to the correctness of the foregoing statement as an abstract proposition of law. But at that time there had been no revocation of the permit granted by the resolution of the common council of April, 1883. This question was again considered by Justice INGRAHAM in the case of *People ex rel. N. Y. Electric Lines Co. v. Ellison* (115 App. Div. 254), in which he contended that, in order to constitute a contract between the city and the relator, there must not only exist an acceptance *but the doing of some act by way of performance* under the permission in order to constitute a consideration making the contract binding, and that otherwise the permission would be but a license merely, revocable at the pleasure of the city. But in that case the demand for the privilege of opening the streets was made before the resolution of the common council had been revoked and the question was not then further considered. But now it appears that the revocation was made before these proceedings were instituted and it, therefore, becomes necessary to consider the question.

In the case of *Capital City Light & Fuel Co. v. Tallahassee* (186 U. S. 401) Mr. Justice PECKHAM, in speaking for the court with reference to the privilege granted by the city of Tallahassee of the use of its streets for lighting purposes, says that "such grant does not become a contract or a vested right so as be protected by the constitution of the state or the United States, until the company has, to say the least, *begun to do the thing required by the charter as a considera-tion for the grant of such privilege.*" (p. 411.)

In the case of *Pearsall* v. *Great Northern Ry. Co.* (161 U. S. 646) Mr. Justice BROWN, in considering many cases bearing upon the subject of privileges granted to corporations, says with reference to such privileges to be protected as a con-

tract "must also be founded upon a good consideration. If it be a mere nude pact, *a bare promise to allow a certain thing to be done,* it will be construed as a revocable license." (p. 667.)  He then refers to the cases of *Rector, etc., of Christ Church* v. *County of Philadelphia* (24 How. [U. S.] 300); *Turnpike Co.* v. *Illinois* (96 U. S. 63), and *Philadelphia & Gray's Ferry P. Ry. Co.'s Appeal* (102 Pa. St.123). Substantially the same doctrine was reiterated by him in the case of *Louisville & N. R. R. Co.* v. *Kentucky* (161 U. S. 677). (See, also, *City Ry. Co.* v. *Citizens' St. R. R. Co.*, 166 U. S. 567; *Postal Tel. Cable Co.* v. *Baltimore*, 156 U. S. 210; *St. Louis* v. *W. U. Tel. Co.*, 148 U. S. 92, 103, and *Chicago City Ry. Co.* v. *People ex rel. Story*, 73 Ill. 541.)   While it is not our custom to cite Special Term decisions, in view of the fact that the justice rendering it has now become a member of this court, we also call attention to the case of *Western Union Telegraph Co.* v. *City of Syracuse* (24 Misc. Rep. 338), in which Hiscock, J., says: "It seems to be quite equitable and pretty thoroughly settled that a franchise thus granted by a municipal corporation *and acted upon and lived up to by the party receiving it,* should be and is in effect a contract, and that the privileges secured by such franchises are property rights which, standing upon the same general basis as other property rights, may not thereafter be withdrawn, impaired or violated by the municipality granting them." (p. 341.) We thus have the converse of the proposition under consideration, which is based upon the fact that the franchise has been acted upon and lived up to.

We are aware that there are many cases in which the granting of a franchise and its acceptance is spoken of as creating a right of property, but generally in those cases there had been partial performance and the question now presented was not raised.  We are also aware that there are cases which tend to support the doctrine that a forfeiture of a franchise can only be adjudicated at the instance of the state, acting through its attorney-general. But the question now presented is not one of forfeiture.

It is as to whether the consent ever amounted to more than a revocable license. During the preceding generation, franchises in the streets of our cities were considered of but little or no value and were readily given away to those promising public service benefits. Now they have become of immense value and the public have become deeply interested in having and enjoying the benefits derived therefrom. We have, therefore, called attention to the more recent decisions of our courts for the purpose of showing their tendency with reference to the granting away of the rights of the public, especially so far as our streets and highways are concerned. And why are they not right? Should a public service corporation be permitted to acquire an irrevocable franchise by mere acceptance without spending a dollar by way of performance, and then hold up the public in its enjoyment of the privileges contemplated by the grant indefinitely, or until they can be bartered away for a fortune? Should the municipalities to whom the legislature has delegated the right to grant permits for the use of their streets for public service purposes be denied the power to revoke licenses granted in case of failure of the grantee to render substantial performance? We think not. No reasons for the deprival of the municipalities of such power are suggested and none are apparent to our minds. We, therefore, incline to the view expressed by the trial court that the mere granting of a permit by a city to a corporation to use the streets for a purpose, is a license merely, revocable at the pleasure of the city, unless it has been accepted and some substantial part of the work performed contemplated by the permission sufficient to create a right of property and thus form a consideration for the contract. We, consequently, conclude, under the circumstances of this case, that the board of estimate and apportionment had the power to and did revoke the permit granted to the relator under date of April 10th, 1883.

The order should be affirmed, with costs.

VANN, WILLARD BARTLETT, HISCOCK, CHASE and COLLIN, JJ., concur; CULLEN, Ch. J., not sitting.

Order affirmed.